```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                      CASE NO. 17-cr-20891-CMA
 3

 4    UNITED STATES OF AMERICA,        Miami, Florida

 5             Plaintiff,              May 25, 2018

 6       vs.                          2:18 p.m. to 3:03 p.m.

 7    ANTHONY GIGNAC,                  Courtroom 12-2

 8             Defendant.              (Pages 1 to 33)

 9   ─────────────────────────────────────────────────────
                          CHANGE OF PLEA
10          BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                   UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     FOR THE GOVERNMENT:    TRINITY JORDAN, ESQ.
13                          Assistant United States Attorney
                            99 Northeast 4th Street
14                          Miami, FL 33132
                            (305) 961-9001
15                          trinity.jordan@usdoj.gov

16   FOR THE DEFENDANT:     STEVEN M. VITALE, ESQ.
                            Law Offices of Steven M. Vitale
17                          29800 Telegraph Rd.
                            Southfield, MI, 48034 ^
18                          (248) 353-6500

19
     Also Present:          Ryan McSeveney, Special Agent U.S.
20                          Diplomatic Security Service

21

22

23

24

25
```

1    **APPEARANCES CONTINUED:**

2     REPORTED BY:          STEPHANIE A. McCARN, RPR
                            Official Court Reporter
3                           400 North Miami Avenue
                            Twelfth Floor
4                           Miami, Florida 33128
                            (305) 523-5518
5                           Stephanie_McCarn@flsd.uscourts.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         I N D E X

2                          WITNESSES

3
     WITNESSES FOR THE GOVERNMENT:                    Page
4                                                      --

5

6
     WITNESSES FOR THE DEFENDANT:                     Page
7                                                      --

8

9    EXHIBITS IN EVIDENCE         PRE     MARKED    ADMITTED

10   Government's Exhibit No.      --       --         --

11   Defendant's Exhibit No.      --       --         --

12

13

14

15

16

17                        MISCELLANEOUS

18                                                    Page
19   Proceedings.......................................  4
     Court Reporter's Certificate.....................  33
20

21

22

23

24

25
```

```
 1          (The following proceedings were held at 2:18 p.m.)

 2              COURT SECURITY OFFICER:  All rise.

 3          THE COURT:  Good afternoon.  Please be seated.

 4          Please state your names.

 5          MR. JORDAN:  Good afternoon, Your Honor.  Trinity

 6   Jordan with the United States.  And with me at counsel table is

 7   Special Agent Ryan McSeveney.

 8          THE COURT:  Good afternoon.

 9          MR. VITALE:  Good afternoon and thank you, Your Honor.

10   Steven Vitale with Mr. Gignac who is present, seated to my

11   left.

12          THE COURT:  All right.  Let's try this one more time.

13          Mr. Gignac, if you'd raise your right hand, please.

14      (The Defendant was sworn.)

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  And you need a microphone, Mr. Gignac.

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Okay.  Thank you.

19          Mr. Gignac, I am going to be asking you some questions

20   this afternoon in order to accept your change in plea from a

21   plea of not guilty to a plea of guilty to all counts of the

22   superseding information.

23          If at any time you do not understand any of my

24   questions, please let me know, and I will try to clarify the

25   question for you.  Also, if at any time you would like to speak
```

1    with your attorney and consult with him off the record, let me

2    know that, and we will pause to give you an opportunity to do

3    so.

4            And, last, please note that you are under oath.  All

5    of your answers to my questions must be truthful.  If they are

6    not, you may be subjecting yourself to charges of perjury.

7            And do you understand these instructions?

8            THE DEFENDANT:  I do.

9            THE COURT:  Please state your full name.

10           THE DEFENDANT:  Anthony Gignac.

11           THE COURT:  How old are you?

12           THE DEFENDANT:  46.

13           THE COURT:  How far did you go in school?

14           THE DEFENDANT:  Second year of college.

15           THE COURT:  And what country are you a citizen of?

16           THE DEFENDANT:  The United States.

17           THE COURT:  Have you ever been treated for a mental

18   illness or for an addiction to narcotic drugs?

19           THE DEFENDANT:  As a child, mental illness.

20           THE COURT:  Okay.  What were you diagnosed with?

21           THE DEFENDANT:  I don't think I -- I know the

22   diagnosis.

23           THE COURT:  All right.  Have you taken any drugs or

24   alcohol in the last 48-hours?

25           THE DEFENDANT:  No, ma'am.

1          THE COURT:  Do you believe that you have any mental or

2  physical condition or illness that prevents you from

3  understanding what's happening here in court this afternoon?

4          THE DEFENDANT:  No.

5          THE COURT:  Mr. Vitale, in your opinion, is your

6  client competent to enter a guilty plea?

7          MR. VITALE:  He is, Your Honor.

8          THE COURT:  Now, Mr. Gignac, prior to today did you

9  receive a copy of the superseding information containing the

10  written charges against you?

11          THE DEFENDANT:  I did.

12          THE COURT:  Have you fully discussed that information

13  and your case, in general, with Mr. Vitale as your attorney?

14          THE DEFENDANT:  I have.

15          THE COURT:  And are you fully satisfied with the

16  counsel, the representation and the advice that you have

17  received from your attorney?

18          THE DEFENDANT:  From Mr. Vitale, yes.

19          THE COURT:  Okay.  So today you plead guilty to a

20  charge, first of all, in Count 1 of impersonating a foreign

21  diplomat or foreign government official, in Count 2 aggravated

22  identity theft and Count 3 conspiracy to commit wire fraud.

23          Do you understand the charges?

24          THE DEFENDANT:  I do.

25          THE COURT:  Mr. Jordan, could you, please, set forth

the elements of these three offenses?

MR. JORDAN:  Yes, Your Honor.  Count 1 is a violation of Title 18 United States Code, Section 915, which is impersonating a foreign diplomat or foreign government official.  There are two elements.  One, the Defendant falsely assumed or pretended to have been a diplomatic counselor -- counselor or other official of a foreign government duly accredited as such to the United States and, two, that the Defendant acted as such.

Count 2 of the superseding information is a violation of Title 18 United States Code, Section 1028A(a)(1) aggravated identity theft.  There are three elements.  One, the Defendant knowingly transferred, possessed or used another person's means of identification; two, without lawful authority; and, three, during and in relation to the eligible felony alleged in the indictment.  In this case it would be a misuse of a passport.

And Count 3 is a violation of Title 18 United States Code, Section 1349, which is a conspiracy to commit wire fraud.  There are two elements.  One, two or more persons in some way or manner agreed to try to accomplish a common and unlawful plan to commit a fraud crime listed in Title 18, Chapter 63, as charged in the indictment; and, two, the Defendant knew the unlawful purpose of the plan and willfully joined in it.

The alleged charge that would -- would be wire fraud.

THE COURT:  And, Mr. Vitale, do you agree that that's

an accurate statement of the elements?

MR. VITALE:  That is, Your Honor.  And I have gone through the superseding indictment, which was filed in April of this year, with Mr. Gignac prior to the plea.

THE COURT:  Superseding information?

MR. VITALE:  Information, that's what I meant to say, Your Honor.  I'm sorry.

THE COURT:  Okay.  Could you please state the steps you've taken to familiarize Mr. Gignac with the charges against him, the Government's evidence, his defenses, his right to proceed to trial and the consequences of a guilty plea?

MR. VITALE:  I have explained to Mr. Gignac, Your Honor, all of the rights he has -- would have pursuant to a trial:  That he would have the right to be presumed innocent, that he would have the right to be proven guilty beyond a reasonable doubt by competent evidence.  The burden of proof would always be on the Government; he would have to prove nothing.  I have gone -- told him he can cross-examine any and all witnesses presented by the Government; I have told Mr. Gignac that.  He can present his own witnesses on his own behalf at any trial.

I've informed Mr. Gignac that he has the absolute right to remain silent, Your Honor, and that silence cannot be used against him or mentioned by the Government.  I have also informed him, Your Honor, that he has the absolute right to

1   testify in addition to the right to remain silent, if he would

2   like.  I have discussed defenses with Mr. Gignac, noting that

3   there are other coconspirators, at least two in this matter.

4   No one else has been charged by indictment or information as of

5   my understanding at this point.  But we have discussed defenses

6   with regard to that.  Additionally, we have discussed possible

7   pretrial defenses, Your Honor, that could be given.

8         Knowing all of that, Your Honor, Mr. Gignac has

9   informed me, knowing everything he could do pursuant to his

10   right to trial that he does want to enter a guilty plea today

11   rather than to proceed forward with trial.

12         THE COURT:  And can you describe the discovery that

13   you have reviewed with your client?

14         MR. VITALE:  Your Honor, I have reviewed all the

15   charging documents.  I have reviewed all the factual proffers

16   with Mr. Gignac.  I have reviewed numerous reports.  I have

17   reviewed e-mails, Your Honor.  I have reviewed a great deal of

18   material that discusses what is alleged to have gone on between

19   Mr. Gignac, two other individuals who are alleged

20   coconspirators, all of their names, who they are.  And I am

21   satisfied that sufficiently, Your Honor, I understand the

22   allegations here and have been able to explain them to

23   Mr. Gignac.

24         THE COURT:  And have you reviewed the discovery with

25   Mr. Gignac?

```
 1            MR. VITALE:  Yes, I have, Judge.

 2            THE COURT:  Now, Mr. Gignac, do you agree with the

 3   summary that your attorney has just provided me and the answers

 4   he has given to my questions?

 5            MR. VITALE:  Yes.

 6            THE COURT:  Mr. Gignac, do you have in front of you a

 7   copy of your written plea agreement?

 8            THE DEFENDANT:  Yes, I do.

 9            THE COURT:  I have what appears to be the original

10   which shows me your signature on Page 8 with today's date.  Did

11   you have the opportunity of reading this and discussing it

12   fully with your attorney before you signed it?

13            THE DEFENDANT:  I have.

14            THE COURT:  Okay.  So what I am going to do at this

15   time is I am going to go over some parts of the agreement with

16   you.  I won't be reading it in full, but I want to assure

17   myself that you understand it and that your plea is voluntary.

18   So I am going to begin by addressing the subject of Paragraph 3

19   without reading Paragraph 3.

20            Paragraph 3 is concerned with sentencing.  Let me

21   describe to you now the sentencing process in my own words.

22   After I accept your plea of guilty here this afternoon, I am

23   going to be asking the court's probation office to prepare what

24   is known as a Presentence Investigation Report.  A probation

25   officer will be assigned to investigate you, your background
```

1    and your offense conduct.  That officer will gather information

2    about you and will prepare a draft Presentence Investigation

3    Report that we will all receive weeks before your sentencing

4    hearing.  Included within the report will be a section that

5    addresses the Federal Sentencing Guidelines.

6         You will see by applying the guidelines to your

7    offense conduct and based upon your history a range of

8    sentencing is produced from a low to a high end that the

9    guidelines suggest as a reasonable sentence.  The attorneys

10    have the ability to file written objections to that draft

11    report, including its guideline computation.  If any objections

12    are filed, the probation officer responds with a written

13    addendum that we also receive before your sentencing hearing.

14         At your sentencing hearing, the attorneys and I

15    discuss the advisory guidelines, and I orally announce here in

16    open court what I believe is your advisory sentencing guideline

17    range.  And what I announce as your guideline range may be

18    different from what you see in the report.  It may also be

19    different from what you and your attorney discuss as a likely

20    guideline range.

21         After I do that, I go on to consider and apply a

22    number of statutory factors before imposing sentence.  So at

23    the end of this process, the sentence I impose may end up being

24    higher than or lower than your advisory guideline range.  I

25    have the authority to sentence you up to the statutory maximum

1    for these offenses, and you may not withdraw your plea of

2    guilty as a result of a sentence imposed.

3              Do you understand?

4              THE DEFENDANT:  Yes.

5              THE COURT:  In Paragraph 6 -- I'm sorry, 4, you are

6    informed of what your maximum possible sentence may be.  As to

7    Count 1, you are looking at a statutory maximum term of

8    ten years' imprisonment, followed by supervised release of up

9    to three years.  As to Count 2, I must impose a term of

10   24 months' imprisonment to be served consecutively to any other

11   sentence I impose, followed by a term of supervised release of

12   up to one year.  As to Count 3, the maximum possible sentence

13   is 20 years' imprisonment followed by supervised release of up

14   to three years.

15             So in total you are looking at a maximum possible

16   sentence of 32 years' imprisonment as well as a fine of up to

17   $250,000, forfeiture and restitution.  And that fine amount is

18   as to each count.

19             Do you understand what your maximum possible sentence

20   may be?

21             THE DEFENDANT:  I do.

22             THE COURT:  In Paragraph 7, the U.S. Attorney's Office

23   will be recommending that I reduce by two levels the sentencing

24   guideline level applicable to your offense because you have

25   accepted personal responsibility.  If your offense level should

be a 16 or greater, then the Government will request an

additional one-level decrease.  And you see that there are

three conditions outlined in Paragraph 7 that you must satisfy

in order for the Government to make these recommendations.

Do you understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  In Paragraph 8, you and the Government

agree, although not binding on Probation or on me, that you

will jointly recommend that I make the following findings.

First, that the amount of actual, probable or intended loss

resulting from your offense in this case is $7,957,253, that

the number of victims is ten or more victims, that a

substantial part of the fraudulent scheme was committed outside

the United States, that the office will not seek an obstruction

enhancement for conduct that was known to the office prior to

the signing of the plea agreement and that you agree to pay

restitution in the amount of $7,957,253.

Do you understand and agree?

THE DEFENDANT:  I do, ma'am.

THE COURT:  In Paragraph 10, you are agreeing to the

entry of a forfeiture money judgment which is attached to your

plea agreement.  And under Paragraph 11, you are waiving any

claim or defense you may have under the Eighth Amendment to the

constitution including a claim of excessive fine or penalty

with regard to the forfeited property.

```
1              Do you understand and agree?

2              THE DEFENDANT:  I do.

3              THE COURT:  In Paragraph 13, you are informed that you

4    have the right to appeal your sentence, but in exchange for the

5    agreement that you have negotiated with the Government, you are

6    giving up your right to appeal your sentence unless it exceeds

7    the statutory maximum or is the result of an upward departure

8    or variance from the guideline range I establish at sentencing.

9              Nothing in the agreement affects the Government's

10   right to appeal.  If the Government does file a notice of

11   appeal, then you are released from your waiver of appellate

12   rights.  You have discussed this appellate waiver provision

13   with your attorney, and you are waiving your right to appeal

14   your sentence knowingly and voluntarily.

15             Is all of this true and correct?

16             THE DEFENDANT:  That issue of the 28, is that just for

17   the sentencing; is that correct?

18             THE COURT:  I'm sorry.  I don't -- I don't understand

19   the question.

20             THE DEFENDANT:  Your Honor, on the giving up my rights

21   to appeal, is that just based on that -- is that just for the

22   sentencing issue?

23             THE COURT:  For sentencing.

24             THE DEFENDANT:  Just for sentencing, okay.

25             THE COURT:  I believe you are also giving up your
```

```
 1    right to appeal your plea of guilty as well.

 2            THE DEFENDANT:  Okay.

 3            THE COURT:  You understand?

 4            THE DEFENDANT:  Yes, ma'am.

 5            THE COURT:  Now, I see an attachment, one forfeiture

 6    of property, and it lists quite a bit of property, a lot of

 7    jewelry.  And you have signed this on today's date as well

 8    forfeiting a number of assets that you have, including sums in

 9    different bank accounts.

10            Did you sign this document freely and voluntarily?

11            THE DEFENDANT:  I did.

12            THE COURT:  Mr. Gignac, is anyone putting pressure

13    upon you, forcing you or coercing you to plead guilty and agree

14    to these terms?

15            THE DEFENDANT:  No.

16            THE COURT:  Did anyone make you any promises or

17    assurances in exchange for your plea of guilty, other than the

18    promises contained in the written plea agreement?

19            THE DEFENDANT:  No.

20            THE COURT:  Are you pleading guilty of your own free

21    will because, in fact, you are guilty as charged?

22            THE DEFENDANT:  Yes.

23            THE COURT:  You understand that the offenses to which

24    you plead guilty are felony offenses.  When I accept your plea

25    of guilty, I will adjudicate you guilty.  And, as a result, you
```

will suffer the loss of valuable civil liberties.  These

include:  the right to vote, the right to hold office, the

right to serve on a jury, the right to possess firearms.  And

in the event that you are not a U.S. citizen, it may be used

against you to deport you to your native country.

THE DEFENDANT:  I do.

THE COURT:  Okay.  I'm going to go over with you at

this time the constitutional rights that you give up by

pleading guilty.  You understand that if this case had

proceeded to a trial, you would have had the right to be

represented by an attorney.  The Government would be required

to bring witnesses to court who would testify in your presence.

You would have the right to confront those witnesses and have

your attorney cross-examine them.  You would have the right to

bring witnesses of your own to testify in your defense.  And if

those witnesses did not wish to come to court, you could use

the Court's compulsory process to get them here.

You would have the right to testify and have your

testimony be considered like that of any other witness in the

case, or you could elect to remain silent.  And if you did so,

that could not be used against you in any way.

You would be entitled to the presumption of innocence.

The Government would have to prove the charges against you

beyond and to the exclusion of every reasonable doubt.  And

that is the highest burden of proof we have in our system of

laws.

Your case would be tried to a jury consisting of 12 members whom you and the Government would select.  And if you lost at trial, you would have the right to take an appeal.

Do you understand by pleading guilty, you give up all of these rights that we associate with trial as well as with appeal?

THE DEFENDANT:  I do.

THE COURT:  Mr. Gignac, do you have another document in front of you, this one entitled "factual proffer" showing showing -- showing your signature on Page 6?  Do you have that there?

THE DEFENDANT:  Yeah, I do.

THE COURT:  Did you have the opportunity of reviewing this and discussing it fully with Mr. Vitale before you signed it earlier today?

THE DEFENDANT:  I did.

THE COURT:  So you agree if this case had gone to trial, the Government would be able to prove beyond a reasonable doubt that starting as early as June 2015 through November 19, 2017, in Miami-Dade County, the United Kingdom and elsewhere, you and your coconspirators knowingly and willfully with the intent to defraud and to obtain money and property by means of false representations knowing the representations were false and fraudulent when made and for the purpose of executing

the scheme and artifice, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signals, pictures and sounds. Between June 2015 and November 2017, you and your coconspirators conducted a large-scale scheme to defraud would-be investors by, among other things, falsely and fraudulently offering them the purported opportunity to invest in various projects which did not, in fact, exist.

Beginning as early as March 24, 2017, through October 25, 2017, in Miami-Dade County, you knowingly and with the intent to defraud the United States falsely assumed and pretended to be a diplomat, counselor and other official of a foreign government duly accredited as such to the United States and act as such, and in such pretended character demanded, obtained and attempted to obtain money, paper, document and other things of value.  You falsely pretended to be a member of the Saudi Arabian royal family, received gifts, privilege and claimed diplomatic immunity.

On October 29, 2017, at the Miami International Airport, you knowingly used a U.S. passport in violation of the conditions and restrictions therein contained and of the rules prescribed pursuant to the laws regulating the issuance of passports in that you presented a passport belonging to D. M. To the United States Transportation Security Administration as proof of identification.

1          On June 23, 2015, you and one of your coconspirators

2    created a fraudulent investment company, Marden Williams

3    International LLC.  MWI sought financial investments from

4    individuals and businesses worldwide for purported business

5    opportunities.  As part of you efforts, you and your

6    coconspirators falsely represented to potential financial

7    investors that you were a member of the Saudi Arabian royal

8    family and had exclusive business opportunities for them to

9    invest in due to your royal status.

10          One of the fraudulent investment schemes you offered

11   was called the Alaska Jersey Limited, purported to be a

12   preinitial private offering of a legitimate private Saudi

13   Arabian business.  You and your coconspirators collected

14   finances from potential investors through loans that you told

15   your victims would be converted into investments over time.

16   For example, F. V., a victim in Switzerland, was deceived into

17   believing he would oversee the European business investment arm

18   of your personal wealth and invested approximately $5 million

19   into the fraudulent scheme.

20          In total, you and your coconspirators stole

21   approximately $7,957,252 from 26 victims worldwide.  You and

22   your coconspirators used the funds to finance your lavish

23   lifestyles, including but not limited to the purchase of

24   Ferraris, Rolls Royces, expensive watches and jewelry, clothing

25   and a two-bedroom property on Fisher Island in Miami, Florida.

1   None of the funds obtained for these fraudulent investments was

2   actually invested in a legitimate business venture.

3           Beginning as early as March 24, 2017, your

4   coconspirators began negotiating on your behalf with owners of

5   a Miami, Florida, hotel for the purchase of a 30-percent

6   interest in the hotel.  Your coconspirators falsely told the

7   hotel that you were a member of the Saudi Arabian royal family

8   and had over $600 million in a JPMorgan account designated for

9   the purchase of the hotel.

10          During subsequent meetings with the owners of the

11  hotel, you represented yourself as a prince of Saudi Arabia.

12  You displayed fraudulent diplomatic license plates on your

13  vehicles, and you hired armed security guards who wore

14  fraudulent diplomatic security badges.  On one occasion, you

15  represented to an associate of the hotel that you had

16  diplomatic immunity because you were a Saudi Arabian prince,

17  and you could break the traffic laws because of this immunity.

18  The owners of the hotel gave you expensive gifts and privileges

19  at their business establishments believing it was customary in

20  dealing with a member of the Saudi Arabian royal family.

21          Your scheme was conducted through the use of thousands

22  of interstate and international e-mails.  On April 1, 2017, one

23  of your victims, F. V., sent an e-mail to you and one of your

24  coconspirators containing instructions on how he would open a

25  Swiss bank account for MWI with a value of $500 million.

1   The e-mail explained you and your coconspirator would

2   need to have a background check conducted before the account

3   could be opened.  F. V. asked you whether he would be

4   transferring the $500 million into the account from the

5   commercial bank of Dubai or from another bank.

6   On September 29, 2017, another coconspirator in the

7   United Kingdom sent you an e-mail with the subject heading

8   transfer letter-MWI Alaska Limited.  In the e-mail the

9   coconspirator stated, "I have the attached transfer letters to

10  be signed by Victim 1, $300,000; Victim 2, $200,000 and

11  Victim 3, $150,000 plus new monies.  The new term will lock

12  them up three years with the new terms."

13  On October 6, 2017, the same coconspirator in the

14  United Kingdom sent you an e-mail with the subject heading

15  Alaska Jersey Limited.  In the e-mail, the coconspirator

16  stated, "I am pleased to confirm that Alaska Jersey Limited has

17  now been fully incorporated.  As you will see, your name is not

18  mentioned anywhere in any of the documents.  Your shares are

19  held in a nominee."

20  During a search of your Fisher Island residence,

21  storage units and a safety deposit box, law enforcement

22  recovered fraudulent diplomatic license plates, a fraudulent

23  diplomatic security badge and business cards with your alias

24  and the titles "his royal highness," "prince" and "sultan."

25  The search also uncovered multiple credit cards and

1      identification cards in your alias names which were used to

2      portray you as a member of the Saudi Arabian royal family.  Law

3      enforcement also found business prospectuses for several

4      fraudulent investment schemes that you and your coconspirators

5      used to entice victims in providing -- into providing loans and

6      investments into your fraudulent investment company.

7              On October 29, 2017, you left Miami International

8      Airport using a fraudulent passport in the name of D. M. To

9      travel to Chicago, Illinois, and then to Hong Kong.  On

10     November 19, 2017, you, again used the passport in the name of

11     D. M. to travel from London to New York City.

12             You were arrested in New York City.  And after waiving

13     your *Miranda* rights, admitted you were not, in fact, D. M. and

14     had traveled from Miami, Florida, using the passport of D. M.

15     without D. M.'s knowledge or approval.  At the time of your

16     arrest, you had in your possession the passport in the name of

17     D. M., two credit cards in the name of D. M., a Social Security

18     card in the name of D. M. and a Florida driver license in the

19     name of D. M.  D. M. is a real person whom you know.

20             Mr. Gignac, are all of these facts true and correct?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Do we have a waiver of indictment or no,

23     Mr. Jordan, for the superseding information?

24             MR. JORDAN:  There -- I think it was -- it was given

25     to the magistrate at the arraignment for it.

1      THE COURT:  Very good.

2          Mr. Vitale, are you satisfied your client understands

3   his rights, what he is giving up today and that there has been

4   a sufficient factual basis for his plea of guilty?

5          MR. VITALE:  Yes, as to all of those questions, Your

6   Honor.

7          THE COURT:  Mr. Gignac, how do you plead now to the

8   charges contained in the superseding information, guilty or not

9   guilty?

10         THE DEFENDANT:  Guilty, Your Honor.

11         THE COURT:  It is the finding of the Court that the

12   Defendant Anthony Gignac is fully competent and capable of

13   entering an informed plea, that he is aware of the nature of

14   the charges and the consequences of his plea based upon his

15   conversations with his attorney and the colloquy before the

16   Court, that the plea of guilty is a knowing and voluntary plea

17   supported by an independent basis in fact containing each of

18   the essential elements of the offenses and that the agreement

19   presented to the Court the voluntarily entered into and not the

20   result of force, threats or coercion.  I also find the

21   Defendant has entered his plea with the advice and the

22   assistance of effect and competent counsel.

23         Your plea is therefore accepted.  You are now adjudged

24   guilty.

25         I will see you back in court on Friday August 3rd at

```
 1    9:00 a.m.

 2              MR. VITALE:  Your Honor, may be go just a little later

 3    than normal?  I am going to be out of town on Friday August the

 4    3rd.  It is going to be the end of a vacation I am going to be

 5    on.

 6              THE COURT:  Mr. Vitale, where are you from, exactly?

 7              MR. VITALE:  I'm from the Detroit, Michigan, area,

 8    Your Honor.

 9              THE COURT:  Detroit.  Okay.

10              How is Wednesday, August 15?

11              MR. VITALE:  That will be good.  Thank you, Your

12    Honor.

13              THE COURT:  We'll do that at 9 o'clock then.

14              MR. VITALE:  May I address one other matter, Your

15    Honor?

16              THE COURT:  Of course.

17              MR. VITALE:  There have been some new, recent

18    developments.  I have informed Mr. Jordan of them, regarding

19    Mr. Gignac.  I am also asking the Court, because at this point

20    I am not being compensated by Mr. Gignac.  I think he may need

21    some counsel here for some other matters that are going to come

22    up, again, that I have discussed with Mr. Jordan.  I am asking

23    that with regard to that he be appointed a public defender.

24    I'll be here for sentencing.  It's not with regard to this

25    case.  It's with regard to another matter.
```

```
 1              THE COURT:  I can only appoint counsel on the case I
 2    have before me, though.  We don't have authority to appoint
 3    sort of like a counselor at large.
 4              MR. VITALE:  Thank you, Your Honor.
 5              THE COURT:  Thank you.
 6              MR. JORDAN:  Thank you, Your Honor.
 7              THE COURT:  Thank you.
 8              MR. VITALE:  Mr. Gignac would like to address the
 9    Court on another matter, Your Honor, relating to --
10              THE COURT:  Let me -- I am looking at my calendar
11    carefully, and I'm thinking it might make more sense for us to
12    do the sentencing -- if you could just pull out your calendars
13    once more -- on -- let me see -- so you are out the week of the
14    6th of August; is that right?
15              MR. VITALE:  No.  You said the 3rd.
16              THE COURT:  3rd.
17              MR. VITALE:  Friday.
18              THE COURT:  Right.
19              MR. VITALE:  I think -- I think on the 6th is when I
20    will be coming -- returning, that week.
21              THE COURT:  Okay.  So why don't we do this.  This is
22    probably better.  Let's do it on Tuesday August 7 at 9 o'clock.
23              MR. VITALE:  Mr. Gignac --
24              THE COURT:  Yes.
25              MR. VITALE:  -- would like to address the Court.
```

1          THE COURT:  Yes, Mr. Gignac.

2          THE DEFENDANT:  Yes.  Good afternoon, Your Honor.  I

3   do have a question about the retainer and -- of Mr. Vitale.

4   Originally, because Mr. Frank Gaviria withdrew, and I was not

5   served the paperwork until yesterday from Mr. Gaviria after

6   numerous e-mails that I would like to present to the Court,

7   where up to the day of the 18th and the 17th of May through the

8   inmates messaging system, Mr. Gaviria -- but I'm here going to

9   just say -- I don't know if I should do it.

10          I need an attorney because Mr. Vitale cannot be paid.

11  We paid all our money to Mr. Gaviria.  And with him quitting

12  without informing me and up to the day that he filed the motion

13  with you, he had been messaging me at the jail telling me that

14  there was no conflict, that he was going to be finishing his

15  work with me, the sentencing memorandum, the PSI all the way up

16  to the day that he was supposed to come see me, um, so it was a

17  shock -- it was a total shock that he would file such a motion

18  and that I was not able to be heard in that motion because of

19  the numerous messages that I have from Mr. Gaviria after Your

20  Honor -- after we spoke, Mr. Gaviria and I spoke, all the way

21  up to the point of the day, as I said, that he filed the motion

22  to you in writing informing me that there was no conflict and

23  that he, in fact, intended to continue to represent me.  And

24  because of that, um, I have been left in a -- in a limbo.

25          Mr. Vitale came on his own today because what had

1  happened was during my representation -- during my hiring of

2  Mr. Gaviria, Mr. Vitale has known me for several years, and I

3  had retained Mr. Vitale to only work on the sentencing

4  memorandum and to be here on my behalf at sentencing only.

5         He was paid that amount of money.  And because he did

6  not want to inconvenience the Court or the Government, he flew

7  here on his own and wanted to receive the plea agreement with

8  the Government.  But, at this point, I am going to need an

9  attorney to be with me at the PSI and to finish this off.

10        I do want to enter one piece of paper that I want to

11 give to you and the Prosecutor because I think it's extremely

12 important in reference to Mr. Gaviria.  The day that he filed

13 the paperwork to you, Your Honor, and the day that he had a

14 conversation with the United States Government, he, in fact,

15 that morning had advised me that we had no conflict, that there

16 was absolutely no conflict and that he intended to -- this is

17 the -- the message that I got using the inmate system dated on

18 May 16, 2018.

19        It says, "Please be advised, if you want to proceed

20 and accept a plea, I didn't bring it up to your attention since

21 I have always acted in your best interest.  I have never had a

22 conflict of interest nor do I have one now.  I want the Court

23 to be aware of the -- of the issues since you brought them up

24 two days ago.  If you feel I've had a conflict of interest,

25 then I would find what appropriate remedy you may have.  Please

1  advise me since the Government does not have to continue to

2  extend any plea.  Also I am nothing but professional with

3  Trinity.  I am friendly with all prosecutors."

4         And my response to Mr. Gaviria was, Yes, I want to

5  plea.  I've always wanted to plea.  I want to be at the

6  hearings -- I want to be at all hearings, including if your

7  file any motions.  I believe that this is extremely important

8  for my protection, not because of the plea but for other

9  purposes because Mr. Gaviria, I believe, fraudulently entered

10  into --

11         THE COURT:  How much money did you pay him?

12         THE DEFENDANT:  We paid him over 18,500.  I also

13  was -- I had a problem with his other -- another attorney that

14  he supposedly brought on to the case.  And the information with

15  Mr. Gaviria has been provided to you and to the Government

16  falsely.  As our last hearing which started out, as Your Honor,

17  Mr. Gaviria -- Mr. Gaviria informed, I believe, the United

18  States Government that my brother had hired and had actually

19  recommended Mr. Gaviria.

20         Mr. Vitale sits here before you today, Your Honor, and

21  Mr. Vitale will state on the record that that's not true,

22  because it was on the recommendation of Mr. Vitale who knew

23  Frank through an association in Miami who is the one that

24  actually had all communications with Mr. Gaviria and hired

25  Mr. Gaviria for me.

1          I have about 60 e-mail messages through the inmate

2    system from him and Ms. Alonso, Ms. Alonso, Evelyn Alonso,

3    which stated all the way up to the date that they had sent this

4    motion to you, Your Honor, stating that he did not have a --

5    that he did not have any conflicts with me and, in fact, that

6    he had been hired to -- that he would continue to do the work,

7    including the PSI.

8          And in the final thing, he even in this one, he -- in

9    this e-mail on the same date, on 5/17, he lashed out at me

10   stating that I caused you and the Government a huge headache

11   and that there would be consequences.  Because of Mr. Gaviria

12   bringing up to you, Your Honor, that he had a conflict, which

13   he had never informed me or the Government.

14         In the E-message he says, "This continuing battle

15   affects -- for someone that's smart, you are not -- you are

16   acting very unintelligently.  You are your own worst enemy.

17   This continuing battle affects only you.  Plenty of work to do

18   on your case, plenty.  But this continuing battle over

19   nonissues, it's a complete waste of time.  We could have been

20   preparing the sentencing memorandum, analyzing this money you

21   actually received, working on getting another debrief, but you

22   wanted to persist in engaging in nonissues.  So be it.  It's

23   your life and your case."

24         It's just -- it's just that I have no idea how an

25   attorney that I -- I retained, how an attorney that I hired to

1    represent me and get -- that I can get duped out of all the

2    fees, including getting duped for a $3500 fee to a woman who

3    Mr. Gaviria hired and presented to our case.  Me and Mr. Vitale

4    had no idea about this lady.  And -- and, honestly, in the

5    letters that he stated me, he then sends -- he then files a

6    motion to you, Your Honor, in this court stating that he does

7    have -- that he does have a conflict.

8         And then what he did is on -- with Mr. Vitale, the --

9    and I wanted to address that because I want Your Honor to know

10   that the reason Mr. Vitale entered into a plea -- I mean, enter

11   into a record of counsel was because three weeks prior to this,

12   Mr. Gaviria contacted my -- Mr. Vitale and said that he needed

13   to be honest as an attorney here for him to come to sentencing.

14        And in this motion here, Mr. Gaviria lied to the

15   Court, lied to me the minute -- the following -- the two

16   mornings -- and I can pass these up if you'd like.  I have a

17   copy for each of you, you, the Prosecutor and the Government --

18   where he stated that morning that he had no conflicts.  And

19   this is putting me at a horrible disadvantage.

20        If it wasn't for the goodness of Mr. Vitale and the

21   Government for at least letting this plea, it could have really

22   harmed me indefinitely.  I mean, we're -- we're fighting for my

23   life.  And by him doing those tactics and using the Court to

24   tell me that you were upset at me and that the Government was

25   upset at me.  And, in fact, in the messages he told me that

1    Mr. Trinity told him that if I did not -- that if I -- that if

2    we did not continue to work, there would be no more plea.

3            And I just find it very uneasy that an attorney, an

4    officer of the court, would go to such an extent to lie to me,

5    message me and tell me that there is absolutely no conflicts,

6    and then he has -- that afternoon he files this -- this motion.

7    And I am not even called into court to -- to be a part of the

8    hearing when I have retained this man to represent me.

9        (Pause in proceedings.)

10           THE COURT:  So I have asked my -- law clerk Dylan Fay

11   who is approaching you just now, to get you from the Florida

12   Bar website a grievance form in case you want to initiate

13   grievance proceedings against Mr. Gaviria.

14           THE DEFENDANT:  Okay.  Thank you, Your Honor.

15           THE COURT:  And those are some forms he's providing

16   you now.

17           THE DEFENDANT:  I appreciate it.

18           THE COURT:  You can take a look at those.

19           THE DEFENDANT:  So I'm going to need an attorney.

20           THE COURT:  Well, you're -- I'm not sure that

21   Mr. Vitale wants to stay on for the sentencing, or if we want

22   to inquire and have a public defender appointed to represent

23   you.

24           Mr. Vitale?

25           MR. VITALE:  Your Honor, I think here in a nutshell is

1    Mr. Gignac's worry.  His worry is that because I will be going

2    back to Michigan that there is going to be a PSI done,

3    objection to a PSI and sentencing memorandum.  His worry is,

4    and it's a legitimate worry, that he cannot compensate me to do

5    all that.  And that being so far away, that's going to be

6    difficult for me to do.  And I think he is correct on both

7    points on that.  So I think the wisest course would be to

8    appoint a public defender for the purposes of sentencing, Your

9    Honor.

10            THE COURT:  So here's the question.  I am looking at

11   Mr. Gignac's pretrial services report.

12            You are still under oath, Mr. Gignac.  Do you own any

13   property?

14            THE DEFENDANT:  Not anymore, no.

15            THE COURT:  Do you have any money in the bank?

16            THE DEFENDANT:  Everything has been -- I've turned

17   everything over to the Government.

18            THE COURT:  Okay.  Do you have any assets stored

19   anywhere that you have not already forfeited to the Government?

20            THE DEFENDANT:  No, everything's been forfeited.

21            THE COURT:  All right.  So I am going to appoint the

22   public defender to represent you today.  And that attorney will

23   be getting in touch with you, I suspect, within the next

24   several days and can represent you from this point forward.

25            THE DEFENDANT:  I appreciate it, Your Honor.  Thank

```
 1    you so much.

 2              THE COURT:  All right.  Is there anything else?

 3              MR. JORDAN:  No, Your Honor.  Thank you.

 4              MR. VITALE:  Nothing.  Thank you, Your Honor, for the

 5    accommodation for my coming out of town, from you and your

 6    staff.

 7              THE COURT:  Thank you.  I hope it's sunnier in Detroit

 8    than it is in Miami these days.

 9              MR. VITALE:  It's actually been 90 the past two days,

10    Your Honor.

11              THE COURT:  It can get very nice up there.

12              MR. JORDAN:  Thank you, Your Honor.

13              THE COURT:  You all have a good day.

14         (The proceedings adjourned at 3:03 p.m.)

15

16                          C E R T I F I C A T E

17

18         I hereby certify that the foregoing is an

19    accurate transcription of the proceedings in the

20    above-entitled matter.

21

22    _07/20/18__

23         DATE                    STEPHANIE A. McCARN, RPR
                                   Official United States Court Reporter
24                                 400 North Miami Avenue, Twelfth Floor
                                   Miami, Florida 33128
25                                 (305) 523-5518
```