UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 17-cr-20891-CMA(s)(s)

UNITED STATES OF AMERICA

v.

ANTHONY GIGNAC
  a/k/a "KHALED AL-SAUD,"
  a/k/a "KHALID AL-SAUD,"
  a/k/a "KHALID BIN AL-SAUD,"
  a/k/a "KHALID BIN SULTAN AL-SAUD,"
  a/k/a "SULTAN BIN KHALID AL SAUD,"

    **Defendant.**
                                       /

## THE UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT

For more than two years, the Defendant was the leader of a sophisticated, multi-person, international fraud scheme. Employing or directing at least five people, the Defendant posed as a Saudi Arabian Prince, created complex fake investment opportunities, and swindled dozens of victims out of millions of dollars. Despite his role overseeing an extensive criminal operation, the Defendant claims in his objections to the Pre-Sentence Investigation Report ("PSI") that he should not qualify as the leader/organizer of his fraudulent scheme (DE 89). He also objects to the application of an enhancement under United States Sentencing Guideline ("USSG") Section 2B1.1(b)(9)(a), and to various factual assertions within the PSI (*id.*) Given the Defendant's role leading an extensive, multifarious fraud scheme, the Government joins probation in urging the Court to apply a four level leader/organizer enhancement under United States Sentencing Guideline ("USSG") Section 3B1.1(a). In accordance with the plea agreement, the Government will not argue for application of the enhancement under USSG § 2B1.1(b)(9)(A). As to the Defendant's remaining objections, the Government requests that the Court rule as set out below.

1

## I. FACTUAL BACKGROUND[1]

Anthony Gignac is a serial con-man who has been committing crimes of deception and fraud since at least 1988. That was the first time the Defendant was arrested for committing crimes while posing as a Saudi Arabian Prince. It would not be the last. The Defendant was born Anthony Moreno in Colombia on July 20, 1970. In 1977, the Defendant and his brother were adopted by a family in Michigan and took their last name (Gignac). After the Defendant's 1988 arrest, he was released on bond and fled to California. The Defendant was ultimately apprehended and convicted for his 1988 crime (*id.*).

Since that time, the Defendant has been arrested and/or convicted for Saudi Prince-related crimes at least *eleven* different times. Most recently, on April 16, 2007, in the Eastern District of Michigan (06-20077-CR-Steeh), the Defendant was sentenced to 77 months imprisonment and five years of supervised release for one count of impersonating a foreign diplomat, and one count of attempted bank fraud (*id.* at 119). In that case, the Defendant defrauded several high-end retailers out of thousands of dollars acting as a Saudi Prince, and also attempted to defraud CitiBank out of $3,000,000 by claiming he was a Saudi Prince. On June 6, 2012, the Defendant's time of supervised release commenced. In February 2014, the Defendant violated his supervised release by leaving the Eastern District of Michigan. On March 4, 2014, the Defendant was ordered to serve another 12 months' imprisonment for his violation, followed by two years of supervised release (*id.*). He was released from that term of imprisonment in March 2015, with his supervised release set to terminate in March 2017. The instant crime spree began almost immediately upon the Defendant's release from prison in March 2015.

---

[1] The factual background section is primarily based on: (1) facts from the PSI (DE 90); and (2) the Defendant's signed factual proffer (DE 43). There is sufficient evidence contained therein to resolve the Defendant's objections, including finding that the Defendant was a leader/organizer of the fraudulent activity. However, if additional information is required, the Government is prepared to offer testimony and evidence concerning the Defendant's role in the offense.

### a. Overview of the Defendant's Criminal Scheme

From March 2015 through November 2017, the Defendant resumed his character as a Saudi Prince in order to scam dozens of investors out of millions of dollars. To do so, the Defendant used a man named C.W. At all times, the Defendant directed and controlled C.W., who was originally charged as a co-conspirator along with the Defendant. The case against C.W. was dismissed after he killed himself in December 2017. The Defendant and C.W. (acting at the Defendant's direction) concocted a variety of fake investments based on the Defendant's purported identity as a Saudi Prince. C.W. would help locate investors and bring them to the Defendant, who used his false persona to trick the victim investors out of millions of dollars. Eventually, the Defendant also employed the following individuals in his fraud scheme: (1) a London-based investor known as K.P. who helped locate potential investors throughout the world; (2) a Switzerland based investor named F.V. who invested around $5 million with the Defendant, and was offered a job as the head of the Defendant's "European Family Office;" (3) a bodyguard named S.B. who helped establish the Defendant's persona as a Saudi Prince; (4) a lawyer who aided the Defendant by sending fraudulent documents on his behalf; and (5) a number of other individuals (including additional bodyguards).

To help solidify his fraudulent persona, the Defendant purchased diplomatic license plates for his car, a DSS badge for his bodyguard S.B., traditional garb associated with the Saudi Royal family, luxury goods consistent with the lavish life of a Saudi Royal, and business cards referring to himself as Prince, HRH (His Royal Highness), and/or Sultan. He ran an Instagram account depicting himself as a prince, with pictures posted of Saudi Royal family members, including the king, with captions such as "my dad." The Defendant referred to himself as a prince when meeting with investors, in emails, and over the phone. He travelled with security, and demanded that certain protocol (i.e., gift giving) be followed when individuals met him to engage in business deals. In all, between 2015-2017, he tricked dozens of people, including people with extensive experience in the

Middle East, into believing he was in fact a Saudi Arabian prince. The Saudi Royal Embassy in the United States has confirmed that the Defendant is not, and never has been, a member of the Saudi Royal family.

### b. The Beginning of the Defendant's Crime Spree: May 2015

In May 2015, while he was living in Michigan, the Defendant began using a LinkedIn account in the name of Khalid Ibn M. Al-Saud to solicit LinkedIn connections with prominent professionals with Arabic or Middle-Eastern sounding names. Sometime in the spring of 2015, the Defendant made contact with his eventual co-conspirator C.W. C.W. was a dual US/UK citizen living in North Carolina. After their initial contact, C.W. and the Defendant appear to have engaged in various low-level business development deals with small to mid-level companies in the United States, offering their connections to Europe and the Middle East as a marketing point. During this time, it is clear that the Defendant was running the show, as C.W. would frequently forward emails to the Defendant for his consideration, review, and edits. The Defendant would respond with words of instruction and encouragement. The Defendant was in Michigan at that time, and C.W. was in North Carolina. They eventually decided to form an investment company in the United States to further their business aspirations (and, eventually, fraud). On June 23, 2015, Marden Williamson International ("MWI") was formed in the State of Delaware.

Throughout their criminal conduct, the Defendant would frequently provide C.W. with fraudulent documents purporting to show that he was a Saudi Prince with access to large amounts of money. For instance, on September 13, 2015, the Defendant (using an alias email account) emailed a false letter to an email account used by C.W. That letter was supposedly signed by "Maha Aziz Al-Rahman," who the Defendant described as the purported personal assistant of "His Royal Highness Prince Sultan Bin Mishaal Sultan Al Saud," at the Erga Palace in Riyadh, Saudi Arabia. The letter stated that the Prince Sultan had full confidence in C.W. to find investments for the

4

remaining $550,000,000 that the Sultan had placed with C.W. It also stated that the Prince Sultan was pleased with the return that C.W. had already achieved on the Prince's original $50,000,000 investment. Those statements were false, and were intended to be used as proof of the Defendant, C.W., and MWI's bona fides. This is a tactic that the Defendant would commonly use over the years to come.

Following the fake letter in September 2015, there were numerous email communications between the Defendant, C.W., and various businesses in which they refer to the Defendant as the Prince or HRH. In those emails, the Defendant and C.W. attempted to get businesses to pay them an up front fee for their purported services in expanding the businesses to Europe and the Middle East. They would eventually move on to more sophisticated fraud schemes.

      c.    **The Defendant's Outreach to European Investors**

In the fall of 2015, C.W. travelled to London on behalf of the Defendant to seek investors. There, he met several British investors, including an experienced investor named K.P. After meeting C.W., K.P. spoke to the "Prince" over the phone, and immediately sought to become involved in arranging investment opportunities for the Prince in the United Kingdom and around the world. The Defendant and C.W. represented to K.P. that the Defendant was in fact Khalid Bin Al Saud, the son of the king of Saudi Arabia, and a Saudi Arabian prince. They provided K.P. with fraudulent bank documents from Saudi Arabia, as well as fraudulent family tree documents of the Saudi Royal family, to convince her that the Defendant was worth billions of dollars as a member of the Saudi Royal family. Eventually, K.P. would help MWI, C.W., and the Defendant obtain investors for MWI. K.P. had experience with international investments after a long career working throughout Europe, and servicing investments in the Middle East. K.P. eventually opened up her own investment firm, and was sporadically paid by the Defendant for her work on his behalf. Her

past experiences, reputation, and relationships allowed her to pitch investment opportunities to potential MWI investors worldwide.

### d. **March 2017: The Defendant Moves to Miami and His Fraud Scheme Grows**

In March of 2017, as soon as the Defendant's supervised release ended in the Eastern District of Michigan, he relocated to Miami, Florida. Through MWI, the Defendant entered into a lease for a two-bedroom condominium on Fisher Island. The Defendant would represent to his victims, and fellow residents of the Island, that he was the owner of the property. Between 2015 and 2017, though primarily in 2017 after the Defendant moved to Miami, the Defendant and C.W. would trick more than 20 different people into investing in MWI. Generally speaking, C.W. or K.P. would locate an investor and put him or her in touch with the "Prince." The Defendant would either speak with the investor over the phone, or meet them in person, in order to prove he was a Prince and sell the victims on certain investments. These investments were usually in the form of a loan at 14.5% to MWI that was supposed to roll over into stocks. But those loans were never invested in the promised opportunity, nor were they generally returned. The early investors were told that MWI, through the Prince, had access to favorable options in a jet fuel trading platform in the Middle East. Later, the investment opportunities varied. They included: (1) investments in luxury hotels; (2) real estate; (3) a Casino deal in Canada; (4) an agricultural deal for a juice producing company; (5) a pharmaceutical company in Ireland; and (6) a supposed pre-IPO stake in Saudi Arabia's state owned oil company – Saudi Aramco. Generally, the victims were told that their investment/loan would go to MWI, but would be earmarked for the specific investment they had been pitched on. These pitches were often supported by fake Saudi documents purporting to show the bona fides of the "Prince." In fact, the Defendant's emails, google drive, and computer show that he created those documents himself. This includes the actual word documents, the websites where the Defendant

found the seals or logos from Saudi Arabia that he falsely used, and the google search history of the Defendant translating his desired message into Arabic.

The final and most audacious investment opportunity pitched by the Defendant and MWI was the Alaska-Jersey project. In that project, the Defendant had K.P. set up a Special Purpose Vehicle ("SPV") in Jersey, United Kingdom. The purpose of the SPV was to allow victims to invest in the SPV with a promised opportunity to later have that money placed into the Prince's 10-20% stake in pre-IPO Saudi Aramco shares. This was around the time Saudi Arabia was considering privatizing the national oil company (Saudi Aramco), and the Defendant was able to convince a number of investors that he actually had a 10-20% stake in Saudi Aramco. As part of that endeavor, the Defendant falsified a number of supposed Saudi documents supporting the deal, including: (1) a fake legal opinion from a Saudi law firm; (2) a fraudulent Deed of Guarantee for Alaska Jersey Limited; and (3) a fake letter from a Saudi law firm attesting to the Defendant's supposed stake in Saudi Aramco. These documents contained forged signatures of high-ranking Saudi figures. Based on the above misrepresentations, the Defendant tricked several victims into investing with himself and MWI.

From 2015-2017, the investment funds fraudulently obtained by MWI totaled roughly $8.1 million. The investors were primarily from the UK, but also included people from Europe, Hong Kong, the U.S., and Canada. The investors ranged from sophisticated investors to friends and family. The funds were not put into business opportunities, legitimate businesses, or any interest-yielding source. Instead, the vast majority of the income went to the Defendant, with a much smaller share paid to C.W. The funds were used to finance the Defendant's lavish lifestyle, including the purchase or lease of Ferraris, Rolls-Royces, expensive jewelry, designer clothing, travel, and a two-bedroom property on Fisher Island.

### e. The Defendant's Role in Relation to C.W. and his Various Employees

Throughout the entirety of his fraud scheme, the Defendant – as the "Prince," the supposed source of money, and the main beneficiary of the fraud – was the unquestioned leader of the scam. He made all crucial decisions, he recruited other participants, he controlled and directed those participants, he created the false Saudi documents that underpinned the entire fraud, he was the main draw that encouraged victim investment, and he received the lion's share of the fraud proceeds. This is shown by: (1) the Defendant's communications with his subordinates; (2) the forensic evidence demonstrating how he created the false documents; (3) the flow of cash through MWI to the Defendant; (4) interviews with the Defendant's victims[2] and subordinates; (5) the supposed deal documents; and (6) other evidence. If required, additional information concerning this evidence can be presented at sentencing.

## II. RESPONSE TO OBJECTIONS

### a. Objection to Paragraphs 15-16

The Defendant objects that Paragraphs 15 and 16 are not part of the instant offense, and therefore should not be included in the "Offense Conduct" section of the PSI. The Government does not object to moving these paragraphs from that specific section. However, the paragraphs should remain in the PSI in a different section, in lieu of complete removal.

### b. Objection to Paragraphs 41-55

The Defendant objects to paragraphs 41 through 55, claiming that the statements made by C.W. are not true and should therefore be stricken. This objection must fail because the Defendant has not objected with "specificity and clarity" as required in the Eleventh Circuit. *United States v. Beckles*, 565 F.3d 832, 844 (11th Cir. 2009). Instead, the Defendant has lodged a blanket objection to fifteen paragraphs of the PSI, without explaining which statements are false and why. C.W.'s

---

[2] Victim statements are attached hereto as Exhibits 1-8.

statements include useful and true information about the Defendant's criminal scheme. However, the relevant paragraphs also detail false statements made by C.W. to law enforcement. Those statements are useful to show C.W.'s knowledge of his own criminal culpability. For instance, upon his initial arrest, C.W. denied knowing Anthony Gignac or Khalid Bin Sultan Al-Saud. He later admitted that he did in fact know the Defendant. Without greater specificity, the Government cannot adequately formulate a response, or provide corroborating evidence proving the veracity of the disputed statements.

To the extent the Defendant is disputing the fact that the statements were made, the Government is prepared to offer testimony showing that the statements were in fact made as set out in the PSI. The statements are relevant to the charge offense, and should be included in the PSI under 18 U.S.C. § 3661. Under Section 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." As such, the statements made by C.W. should remain in the PSI to aid in sentencing.

Finally, to the extent the Defendant is objecting to the use of C.W.'s statements in support of an enhancement, the Government's response is two-fold. First, there is sufficient evidence within the unobjected-to parts of the PSI, and the Defendant's factual proffer, to establish his role as a leader/organizer in the criminal offense. This includes: (1) the Defendant's extensive history of committing Prince-related crimes (PSI ¶¶ 108-128); (2) the Defendant's role in the instant scheme (PSI ¶¶ 19-24); (3) the description of the Defendant's role in negotiating hotel deals (PSI ¶¶ 25-33); (4) the search of the Defendant's residence (PSI ¶ 36); (5) the Defendant's use of his fraudulently obtained funds (PSI ¶ 37); (6) the Defendant's post-arrest orders to C.W. and K.P to help cover up his crime (PSI ¶ 40); (7) the Defendant's post-arrest conduct, including his continued efforts to portray himself as a member of, or associate of, the Saudi Royal family (PSI ¶¶ 58-61); (8) S.B.'s

description of C.W. and K.P. as "assistants" of the Defendant (PSI ¶ 62); (9) the description of the Defendant's role in additional hotel deals (PSI ¶¶ 74-79); and (10) B.S.'s statement that "the prince told her on multiple occasions that he was in charge of all the business ventures with Williamson and that he [the Prince] was the boss" (PSI ¶ 86).  Second, if additional evidence is required, the Government is prepared to offer evidence through testimony and exhibits at sentencing.

### c. Objection to Paragraph 68

The Defendant objects to paragraph 68 of the PSI, claiming that he was never verbally abusive or threatening to his bodyguard S.B., or to S.B.'s wife.  This objection must fail because S.B. did in fact make that statement, and the statement falls within the wide berth of 18 U.S.C. § 3661.  The statement is not being used in support of an enhancement, but rather to provide information about the Defendant and how he treated people.  The inclusion of that statement is therefore appropriate under Section 3661.  To the extent the Defendant is contesting the fact that S.B. made the relevant statement, the Government is prepared to offer testimony and evidence showing that the statement was made.

### d. Objection to Paragraphs 69-71

The Defendant objects to paragraphs 69-71, claiming that the statements made by K.P. are untrue and should therefore be stricken from the PSI.  Again, this objection fails because the Defendant has not objected with "specificity and clarity" as required in the Eleventh Circuit. *Beckles*, 565 F.3d at 844.  Instead, the Defendant has lodged a blanket objection to three paragraphs of the PSI containing multiple statements.  He has not explained which specific statements are false, or why they are false. Further, K.P.'s statements – to the extent they are not being used to support an enhancement – fall within 18 U.S.C. § 3661, and are therefore appropriately considered by the

10

Court. To the extent the statements are relevant to the Defendant's leader/organizer enhancement, the Government will adopt the same approach reflected above with regard to the statements by C.W.

### e. Objection to Paragraphs 87 and 100: The Defendant was the Leader and/or Organizer of the Criminal Scheme He Oversaw

The Defendant objects to paragraphs 87 and 100, claiming that he does not qualify as a leader or organizer under USSG Section 3B1.1(a). That argument fails because: (1) the Defendant was the leader of a criminal scheme involving co-conspirator C.W. and multiple employees; and (2) the criminal activity that the Defendant oversaw was "otherwise extensive" as required by the Sentencing Guidelines. Under USSG Section 3B1.1(a), the Defendant's offense level must be increased by four levels "if the defendant was an organizer or leader of a criminal activity that involved five or more participants *or* was otherwise extensive." The Defendant's conduct here easily satisfies that requirement.

#### i. The Defendant was the Leader/Organizer of his Fraud Scheme

To qualify for a § 3B1.1(a) enhancement, the defendant need only have been an "organizer, leader, manager, or supervisor of one or more of the other participants." U.S.S.G. § 3B1.1 cmt. n.2. Factors to consider in determining whether a defendant acted as an organizer or leader include: (1) "the exercise of decision making authority," (2) "the nature of participation in the commission of the offense," (3) "the recruitment of accomplices," (4) "the claimed right to a larger share of the fruits of the crime," (5) "the degree of participation in planning or organizing the offense," (6) "the nature and scope of the illegal activity," and (7) "the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4; *see also United States v. Caraballo*, 595 F.3d 1214, 1231 (11th Cir. 2010).

Here, the Defendant was the leader/organizer of his former co-defendant C.W., and of the various employees he used in carrying out his scam. As mentioned above, the Defendant used C.W. and K.P. to help find investors for his fraudulent investments, he offered F.V. a position managing

11

his wealth in Europe in order to locate additional investors, he employed S.B. and other body guards to give legitimacy to his status as a foreign Prince, and he employed a lawyer who sent fraudulent documents to potential investors in order to legitimize the Prince's scheme. In overseeing those individuals, the Defendant was the sole decision maker. He was the "Prince," the sole source of great wealth, and the lure for each of his victims. He directed his co-conspirator and employees on matters big and small, from how they would interact at meetings with investors, to which deals they would fabricate and which investors they would pursue. He controlled his co-conspirator/employees, and was the scheme's ultimate decision maker.

As to the nature of the Defendant's participation in the crime, he was the linchpin of the entire operation. The core of the scheme was that the Defendant had: (1) great wealth; and (2) access to lucrative business deals by virtue of his status. His false persona is the reason the fraud worked. His victims believed that the Defendant was in fact a Saudi Prince, and they wanted to make money through the investments he offered. The fraudulent scheme would not have worked without him. He was "His Royal Highness," "Sultan," and the "Prince." He was above his co-conspirators and employees in both title and in role. In addition to posing as a Prince, the Defendant created the fraudulent documents used support his false persona, and provided those documents to his co-conspirator, his employees, and the victim investors. Neither the Defendant's employees nor C.W. could have executed the scheme independent of the Defendant. The Defendant was singularly responsible as the leader of his scheme.

Further, the Defendant was responsible for the recruitment of his various accomplices, both the willing and the unwitting. He recruited C.W. to serve as his front-man, he recruited K.P. to help obtain investors, he offered to hire F.V. to give his operation legitimacy in Europe and bring in other investors, he hired S.B. as a bodyguard to further his royal appearance, and he used his lawyer to spread fraudulent documents to potential investors. The Defendant was responsible for bringing

12

each of those individuals into his criminal scheme. Thus, this factor weighs heavily in favor of finding that the Defendant was a leader/organizer.

Finally, the Defendant claimed and received the majority of the ill-gotten funds. The funds were directed into bank accounts of MWI, and were primarily used by the Defendant to support his lavish lifestyle as a Prince. After the Defendant, the next largest beneficiary of the fraud was C.W., who received only 12% of the fraudulently obtained funds. K.P., as payment for her services, received only 4% of the fraudulently obtained funds. The Defendant, as Prince, received and used the majority of the fraudulently obtained funds. In light of the foregoing, there can be no doubt that the Defendant was the leader/organizer of his employees and C.W. He used those people to swindle his victims out of millions of dollars.

### ii. The Fraud Scheme Led by the Defendant was "Otherwise Extensive"

An "otherwise extensive" operation does not require a set number of criminally responsible participants. *United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994). "Although this circuit does not employ a precise definition for the 'otherwise extensive' standard, there are a number of factors relevant to the extensiveness determination, including the length and scope of the criminal activity, as well as the number of persons involved." *Id*. at 1046. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, cmt. n. 3. For instance, in *United States v. Rodriguez*, 981 F.2d 1199, 1200 (11th Cir. 1993), the Eleventh Circuit held that the facts established that the defendant was involved in an "otherwise extensive" criminal activity when he "was organizing a drug transaction that extended from Columbia to Florida to Boston to New York, and which included the purchase and street distribution of 100 kilos of cocaine

worth $350,000 in the wholesale market." The criminal scheme overseen by the Defendant was significantly more extensive than *Rodriguez.*

Here, the Defendant oversaw at least five individuals in carrying out his scheme. The scheme lasted for over two years, from the Defendant's efforts to establish a network of prominent Arab individuals in May 2015, through his arrest in November 2017. The scheme was geographically extensive as well, stretching from Michigan, to Florida, North Carolina, the United Kingdom, Saudi Arabia, Dubai and Hong Hong. The Defendant sought and obtained investors from all over the world, including the United States, the United Kingdom, Canada, and Hong Kong. The Defendant traveled abroad to lure his investors, and he had victim investors and employees travel to the United States to meet him. The Defendant used sophisticated investment opportunities to lure victims, including convertible loans, bond offerings, special purpose vehicles, and pre-IPO Saudi Aramco shares. The Defendant established relationships with MWI in North Carolina, with K.P.'s company in the U.K., with F.V. in Switzerland, and with other investors throughout the world. He supported his scheme with intricate false documents from Saudi Arabia (bearing false signatures of high-ranking Saudi officials), with false diplomatic plates purchased from Russia, with a fake DSS badge, and with all the trappings of a Saudi Prince. He ultimately obtained over $8 million from more than 20 different investors. Compared to the limited transaction in *Rodriguez*, the criminal conduct led by the Defendant was significantly more extensive – in temporal scope, geographic scope, sophistication of activity, and loss caused. His conduct, and the scheme he led, inarguably satisfies the "otherwise extensive" standard set by the USSG and the Eleventh Circuit. The Court should therefore apply the 4 level enhancement recommended by probation under USSG 3B1.1(a).

      **f.  Objection to Paragraph 97: Acting on Behalf of a Government Agency**

The Defendant objects to paragraph 97 by noting that the parties have jointly agreed that they will not recommend the application of the "acting on behalf of a government agency"

enhancement pursuant to the Defendant's plea agreement. That is a correct description of the plea agreement.

### g. Offense Level Computation

The Defendant requests an adjusted offense level of 26 with a criminal history category of VI. That request is based on the suggested removal of the following enhancements from the PSI: (1) the four level enhancement for leader/organizer under USSG 3B1.1(a); and (2) the two level enhancement for "acting on behalf of a government agency" under USSG 2B1.1(b)(9)(A). As noted above, the Government agreed it would not recommend an enhancement under Section 2B1.1(b)(9)(A). However, because the Defendant qualifies as a leader/organizer, the four level enhancement should apply. Thus, the appropriate adjusted offense level is 30, and the Defendant's criminal history category is VI. This results in a guidelines range of 168-210 months, followed consecutively by 24 months on the aggravated identity theft charged in Count 12.

## III. CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court find that the Defendant qualifies for a four level enhancement as a leader/organizer. As to the rest of the objections, the Government requests that the Court rule as requested above.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: /s/ Frederic C. Shadley
FREDERIC C. SHADLEY
Assistant United States Attorney
Court ID No. A5502298
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9349
Frederic.Shadley@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 30, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, thereby serving the document on all parties.

/s/Frederic C. Shadley
Frederic C. Shadley
Assistant United States Attorney
